UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
                              :
INTERNATIONAL BUSINESS        :    11 Civ. 399 (LAP)
MACHINES CORPORATION,         :
                              :
          Plaintiff,          :    FINDINGS OF FACT &
                              :    CONCLUSIONS OF LAW
     -v.-                     :
                              :
GIOVANNI G. VISENTIN,         :
                              :
          Defendant.          :
                              :
------------------------------X

## Table of Contents

I. Facts ................................................. 3

  a.  IBM................................................. 3

  b.  Hewlett-Packard..................................... 4

  c.  IBM's Noncompetition Program........................ 5

  d.  Mr. Visentin's Employment at IBM.................... 5

  e.  The Noncompetition Agreements....................... 9

  f.  Mr. Visentin's Employment at HP.................... 10

  g.  Purported IBM Trade Secrets and Confidential Information. 13

     i.  I&VT Meetings .................................. 13

     ii. I&VT Task Force on Business Analytics .......... 14

     iii. Cloud Computing ............................... 14

     iv. Client Pipelines .............................. 15

     v.  Pricing of Deals .............................. 15

     vi. Troubled IBM Clients .......................... 16

     vii. Knowledge of Potential IBM Acquisition ....... 16

II.Discussion ........................................... 16

  a.  Preliminary Injunction Standard.................... 16

  b.  Application to the Present Motion.................. 17

     i.  Irreparable Harm .............................. 18

1.   Trade Secrets ....................................... 21
   a.   I&VT Meetings ...................................... 25
   b.   I&VT Task Force on Business Analytics ............. 26
   c.   Cloud Computing ................................... 27
   d.   New Service Offerings Other Than Cloud ............ 32
   e.   Potential Acquisition Target ...................... 32
   f.   Client Pipelines .................................. 33
   g.   Strategic Business and Marketing Plans ............ 34
   h.   Operation Finances of ITS ......................... 35
   i.   Pricing Strategies ................................ 36
   j.   Troubled Clients .................................. 38
   k.   IBM Strategies to "Attack HP" ..................... 39
2.   Inevitable Disclosure .............................. 40
   a.   Near Identity of Positions ........................ 43
   b.   Value of Purported Trade Secrets to HP ............ 48
ii. Likelihood of Success on the Merits .................. 51
   1.   Whether the Agreement Is Greater Than Necessary to
        Protect a Legitimate Interest ............................ 52
   2.   Whether the Agreement Imposes an Undue Hardship ..... 58
   3.   Public Policy ........................................ 59
   4.   Conclusion and Coda ................................. 60
iii. Sufficiently Serious Questions Going to the Merits ... 61
III. Conclusion .............................................. 62

LORETTA A. PRESKA, Chief United States District Judge:

Plaintiff International Business Machines Corporation ("Plaintiff" or "IBM") seeks a preliminary injunction against Defendant Giovanni Visentin ("Defendant" or "Mr. Visentin"), a former IBM executive, to enforce a noncompetition agreement by restraining Mr. Visentin from working for Hewlett-Packard Company ("HP") for a period of twelve months.  Early in the

morning of January 19, 2011, Mr. Visentin notified IBM of his intention to leave IBM to work for HP.  On January 20, 2011, IBM filed a complaint including claims for breach of contract and misappropriation of trade secrets.  On January 24, 2011, the Honorable Cathy Seibel entered a temporary restraining order and scheduled a preliminary injunction hearing.  Due to a scheduling conflict, the case was subsequently transferred to the undersigned.  Beginning on February 1, 2011, the Court heard extensive testimony from five witnesses and reviewed a substantial number of exhibits.[1]  For the reasons set forth below, IBM's application for a preliminary injunction is DENIED.

I.   Facts

    a. IBM

    IBM is a leading technology company, with approximately 400,000 employees and operations in more than 170 countries. (Tr. 273:17, 579:4-10.)[2]  IBM is organized into several principal

---

[1] Despite the extensive evidence placed before the Court during the four-day hearing, Plaintiff did not consent to treating this hearing as a trial on the merits.

[2] In reaching its findings of fact, the Court relies on the testimony of witnesses presented during the February 1-4, 2011 hearing and the February 11, 2011 oral arguments ("Tr."); the parties' exhibits presented during the hearing ("IBM Ex." and "Def. Ex."); the Declaration of Patrick Kerin in Support of IBM's Order to Show Cause ("Kerin Decl."), dated January 19, 2011; the Declaration of Giovanni Visentin ("Giovanni Decl."), dated January 19, 2011; and the Declaration of Tom Iannotti ("Iannotti Decl."), dated January 19, 2011.

business segments, including Global Technology Services ("GTS")
(Tr. 25:3-7.)  GTS assists companies in assessing, designing,
implementing, and running their computer infrastructure and
network systems.  (Tr. 25:20-27:12; Kerin Decl. ¶¶ 11-12)  GTS
has four business segments, including Strategic Outsourcing
("SO"), Integrated Technology Services ("ITS"), Maintenance, and
Global Processing Services.  (Tr. 20:22-22:8.)  The SO group
deals mostly with technology services.  Through the SO group,
IBM can provide infrastructure, networking, and end-user
support.  (Tr. 16:3-17:23.)  IBM either provides the technology
platform only or it also takes over and runs clients' servers,
storage, or networks under long-term contracts.  (Id.; Kerin
Decl. ¶ 13.)  ITS provides clients with nearly 180 different
infrastructure technology services, including services to
improve data storage capabilities, provide business continuity
and recovery services, protect networks from viruses, design new
cloud computing infrastructures, and implement data security
systems.  (Tr. 34:21-36:4, 455:16-25, 529:21-530:20; Kerin Decl.
¶¶ 13-15.)

     b. Hewlett-Packard

HP is a global technology provider and a major IBM
competitor.  (Tr. 261:19-24; IBM Ex. 208 at 2-3.)  HP operates
in more than 170 countries and has about 300,000 employees
worldwide.  (IBM Ex. 208 at 2-3.)  HP is organized into several

principal business segments, including Enterprise Services ("ES").  HP's ES group includes three segments:  Application Services, Business Process Outsourcing, and Infrastructure Technology Outsourcing ("ITO").  (Tr. 46:9-19, 547:6-10.)

   c. IBM's Noncompetition Program

IBM requires over 1700 employees to sign noncompetition agreements.  (Tr. 577:11-14.)  More than 300 IBM employees are required to sign a form noncompetition agreement identical to the one signed by Defendant.  (Tr. 577:19-21.)  IBM did not negotiate the terms of these agreements, and historically the agreements were not modified.  (Tr. 577:22-578:5, 592:24-593:7.) IBM's noncompetition program works in tandem with a "clawback" mechanism.  (Tr. 589:22-24.)  If an employee violates the noncompetition agreement, IBM can choose to invoke the clawback mechanism and cancel all of that employee's unvested and unexercised equity grants.  (Tr. 590:16-591:13.)  IBM can also require employees to repay IBM for the equity options the employee has exercised and redeemed within the last two years. (Tr. 591:14-591:23.)

   d. Mr. Visentin's Employment at IBM

Mr. Visentin worked at IBM for twenty-six years prior to his resignation on January 19, 2011.  (Tr. 275:23-24)  Mr. Visentin was a business manager, not a technical expert. (Tr. 351:5-9, 422:15-23.)  During his career, Mr. Visentin held

several management positions in different geographic and business divisions across IBM.  From 2004 to 2006, Mr. Visentin was the Client Advocacy Executive in the Office of the Chairman.  (Visentin Decl. ¶ 9; IBM Ex. 211 at 4.)  In 2006, Mr. Visentin moved into the ITS group as Global Vice President of End-User Services, responsible for the development and sale of end-user products and services.  (Visentin Decl. ¶ 10; IBM Ex. 211 at 3.)  End-User Services is only one of the nine service lines offered by ITS.  (Tr. 349:25-351:3.)

In September 2007, Mr. Visentin became General Manager of IBM's ITS business.  (Tr. 267:10-13.)  The ITS business generates approximately 5000 to 9000 deals per quarter and total revenue of $2.5 billion annually.  (Tr. 349:13-24, 427:20-21, 455:16-18.)  Mr. Visentin had eight direct reports who were responsible for various aspects of the ITS business.  (Tr. 350:3-4.)

For the first year of his tenure as General Manager of ITS, Mr. Visentin was responsible for the Americas, which included North America, Canada, and Latin America.  (Tr. 357:11-16.)  He ceased having responsibility for Latin America approximately two years before his resignation.  (Id.)  Neither Mr. Visentin nor anyone on his ITS teams had responsibility for Application

Services ("Applications").[3]  (Tr. 358:9-21.)  Additionally, Mr.
Visentin was not responsible for Business Process Outsourcing
("BPO") at IBM. (Tr. 6:10-12, 358:22-359:6.)

   IBM's ITS and SO business segments offer some overlapping
services, but they differ in scope and function.  SO designs,
implements, and runs clients' technology infrastructure,
including servers, storage, or networks, under long-term
contracts.  (Tr. 16:3-17:23; Kerin Decl. ¶ 13.)  ITS provides
more narrowly scoped project-based services, sometimes as part
of a broader bid coordinated by the SO group.  (Tr. 16:3-17:23;
Kerin Decl. ¶ 13.)  As the ITS General Manager, Mr. Visentin was
not responsible for IBM's SO deals.  (Tr. 426:20-427:3.)

   Mr. Visentin's ITS teams sometimes participated in SO bids
if an SO team requested that ITS bid on a component of a SO
deal.  (Tr. 352:11-23.)  Both ITS and SO deals involved four
basic steps: assessment of the client's need for a service,
designing a plan to address those needs, implementing that plan,
and, in SO deals, running the service purchased by the client.
(IBM Ex. 196 ("Assess-Design-Implement-Run").)  Mr. Visentin was
not personally involved in the execution of any of those four
steps with respect to ITS deals or ITS components of SO deals.

---

[3] There are two separate units at IBM, both outside of ITS and
GTS, that are responsible for applications and similar services
at IBM; Mr. Visentin did not manage either unit.  (Tr. 235:6-
236:23.)

(Tr. 355:10-357:10, 419:10-421:9.)  Instead, members of Mr. Visentin's ITS team worked on the details of each step of the process.  (Tr. 355:10-357:10, 419:10-421:9.)  These individuals were the "front line" players and specialists who worked five to seven layers below Mr. Visentin in the chain of command.  (Tr. 355:10-357:10.)  Unlike Mr. Visentin, these individuals were mostly designers and architects with technical backgrounds in the information technology and computer science fields.  (Tr. 355:10-357:10, 419:10-421:9.)  Mr. Visentin does not have the technical expertise or know-how that would enable him to design or implement technology-based solutions for client needs.  (Tr. 419:3-422:23.)

In December 2008, Mr. Visentin was appointed to IBM's Integration and Values Team (the "I&VT"), a leadership group that develops IBM's corporate strategy.  (Tr. 56:23-57:12, 273:3-21.)  The approximately 325 members of the I&VT are chosen by the chairman of IBM. (Tr. 57:1-5, 593:19-22.)  These leaders are charged with addressing some of the strategic and other important issues facing IBM.  (Tr. 56:23-57:12, 58:13-59:16, 594:5-595:11.)

Mr. Visentin was also selected to join an I&VT task force focused on a global strategic initiative in "Business Analytics," the in-depth analysis of client data to assist clients in their businesses.  (Tr. 59:17-60:20, 275:3-16,

8

374:12-16.)  The task force made recommendations to IBM's senior

leadership.  Mr. Visentin attended and participated in I&VT

Business Analytics meetings in 2010.  (Tr. 59:17-60:20, 275:17-

22, 374:12-16.)

    e. The Noncompetition Agreements

   Mr. Visentin signed two noncompetition agreements with IBM,

the first on July 16, 2008 (IBM Ex. 1 (2008 Noncompetition

Agreement)) and the second on July 29, 2009 (IBM Ex. 3, (2009

Noncompetition Agreement)).  The 2009 Noncompetition Agreement

(the "Noncompetition Agreement") provides that "during [Mr.

Visentin's] employment with IBM and for twelve (12) months

following the termination of [his] employment . . . [Mr.

Visentin] will not directly or indirectly within the 'Restricted

Area' (i) 'Engage in or Associate with' (a) any 'Business

Enterprise' or (b) any competitor of the Company." (Id.

§ 1(d).)  In the Noncompetition Agreement, the following terms

are defined:

   • "Restricted Area" is "any geographic area in the
   world   for   which   [Mr.  Visentin]   had   job
   responsibilities during the last twelve (12) months of
   [his] employment with the IBM." (Id. § 2(e).)

   • "Engage   or   Associate   with"   includes   "without
   limitation   engagement   or   association   as   a   sole
   proprietor,   owner,   employer,   director,   partner,
   principal,   investor,   joint   venture,   shareholder,
   associate, employee, member, consultant, contractor or
   otherwise." (Id. § 2(c).)

   • "Business Enterprise" is "any entity that engages in

. . . competition with any business unit or divisions of the Company in which [Mr. Visentin] worked at any time during the three (3) year period prior to the termination of [his] employment. (Id. § 2(a).)

Mr. Visentin also agreed to a nonsolicitation covenant, which provided that "during [his] employment with IBM and for twelve (12) months following the termination of [his] employment . . . [he] will not directly or indirectly within the 'Restricted Area' . . . solicit, for competitive business purposes, any customer of the Company with which [he was] involved as part of [his] job responsibilities during the last twelve (12) months of [his] employment with IBM" and "for the two (2) year period following the termination of [his] employment . . . [he] will not directly or indirectly within the 'Restricted Area,' hire, solicit or make an offer to any employee of the Company to be employed or perform services outside of the Company." (Id. § 1(d).)

     f. Mr. Visentin's Employment at HP

HP offered a position to Mr. Visentin late in the evening of January 18, 2011. Mr. Visentin accepted that offer within an hour and immediately notified IBM. (Tr. 299:10-14; IBM Ex. 192.) In his resignation letter, Mr. Visentin expressed a desire to leave immediately but offered to remain employed for a reasonable transition period. (IBM Ex. 192.) IBM apparently declined the offer by sending a Human Resources employee to Mr.

Visentin's house within hours to collect his laptop.  (Visentin
Decl. ¶ 35.)  Mr. Visentin's resignation, therefore, took effect
later in the day on January 19.  (Id. ¶¶ 35-36.)  HP hired
Visentin to be its Senior Vice President, General Manager,
Americas for HP Enterprise Services.  He will be responsible for
managing the three business segments within HP's ES group: BPO,
Applications, and ITO.  (IBM Exs. 192, 230.)  At HP, these
business segments have the following roles: (a) BPO offers
business- and industry-focused outsourcing services for customer
relationship management, document processing, finance and
administration, and HR and payroll; (b) Applications helps
organizations plan, develop, integrate, and manage custom
applications, packaged software, and industry-specific
solutions; and (c) ITO focuses on companies' IT infrastructure
and includes services for data centers, networking, security,
and short-term desk support (or "workplace services").
(Iannotti Decl. ¶ 3.)

     HP hired Mr. Visentin because he is a "process-oriented
thinker" and has skills in managing large teams.  (Tr. 541:20-
25.)  HP does not expect Mr. Visentin to have or use "technical
knowledge of things like cloud and the various technical
products and services offered by HP."  (Tr. 544:5-11.)

     Mr. Visentin did not provide any IBM confidential
information or trade secrets to HP or its recruiting firm,

11

Heidrick & Struggles ("H&S"), during the interview process. (Tr. 381:19-383:7.)  Mr. Visentin provided H&S a client list that included nothing but the names of clients (not revenue figures), most of which are well-known to HP and the industry. (Tr. 194:8-194:18; Def. Ex. 25.)  Mr. Visentin provided that list for the sole purpose of allowing H&S and HP to assess his noncompetition agreement with IBM and determine how to "fence" him off from those clients.  (Tr. 377:11-378:23; Def. Ex. 25.)

After discussing the nature of the proposed position at HP, both Mr. Visentin and HP's primary decisionmaker, Mr. Tom Iannotti, determined that it was feasible to structure the HP job so that it was different from Mr. Visentin's previous IBM position in terms of subject area, geographic scope, and level of responsibility.  (Tr. 551:10-555:16.)  HP offered Mr. Visentin a high-level management position and agreed to narrow the job during an appropriate period of time to minimize any potential overlap with the job that Mr. Visentin performed at IBM.  (Id.; Iannotti Decl. ¶¶ 7-11.)  HP and Mr. Visentin agreed to the following restrictions on Mr. Visentin's duties in order to avoid violating the Noncompetition Agreement:

> i.   Mr. Visentin will be responsible for the BPO and Applications segments of HP's Enterprise Services business.  He did not work in those areas at IBM, and has no confidential information about those facets of IBM's business;

ii. Mr. Visentin will oversee HP's ITO business in the United States and Canada, but only for those existing, installed clients whose contractual arrangements with HP are not up for renewal in the next year;

iii. Mr. Visentin will be completely excluded from working with any client for which he served as the "partner executive" while at IBM through its "Partner Executive Program." This restriction applies worldwide and without regard to business segment; and

iv. Mr. Visentin will be responsible for the full range of ITO services to HP's clients in Mexico and Latin America, because he did not work in those regions since 2009.

(Tr. 551:20-555:16, 553:2-555:16; Iannotti Decl. ¶ 8; IBM Ex. 192.)

g. Purported IBM Trade Secrets and Confidential Information

After his resignation from IBM, Mr. Visentin did not keep a single IBM document in any format, including electronic documents. (Tr. 542:19-22.)

i. I&VT Meetings

Mr. Visentin attended two I&VT meetings, one in 2009 and one in 2010. Mr. Visentin resigned prior to the 2011 I&VT meeting and had not attended an I&VT meeting since January 2010, more than a year before he resigned. (Tr. 56:23-58:7.) From 2005 to 2009, some members of the I&VT were not required to sign noncompetition agreements, despite being privy to precisely the same purported trade secrets and confidential information to which Mr. Visentin was exposed. (Tr. 585:15-586:4.) None of

13

IBM's witnesses identified any specific information shared with I&VT members in January 2010 that would be harmful if disclosed to HP in 2011.

### ii. I&VT Task Force on Business Analytics

In 2010, Mr. Visentin participated in a Task Force that examined IBM's Business Analytics initiative, but he does not possess any documents relating to his work on the Business Analytics task force. (Tr. 374:17-23.)  The parties agree, however, that HP does not compete in the Business Analytics area. (Tr. 181:2-22.)

### iii. Cloud Computing

HP and IBM compete in the important emerging market called cloud computing.  Cloud computing allows businesses and individuals to use the Internet to access software programs, applications, and data from computer data centers managed by providers such as IBM and HP.  Cloud computing services are not a unitary product but rather a continuum of services which businesses are able to access on an as-needed basis.  (Tr. 127:6-133:9; IBM Ex. 18.)  These services range from "public cloud" services - that is, pre-packaged standard services - to "private cloud" services – that is, highly individualized services designed specifically for a single client.  (Tr. 127:6-133:9; IBM Ex. 18.)  IBM, HP, and others will compete in the area of cloud computing technology for the next several years.

14

(Tr. 327:10-12, 55:21-23)  Mr. Visentin does not know the architecture or design of cloud. (Tr. 356:10-13)

### iv. Client Pipelines

Mr. Visentin was aware of prospective deals (the "pipeline") within ITS.  The ITS pipeline contained an estimated 5000 to 9000 deals per quarter.  (Tr. 349:13-24.)  Mr. Visentin also received high-level and generalized information about the SO pipeline at management meetings.  (Tr. 371:6-372:14.)  The reports distributed to attendees, however, contained no detailed information such as solutions, specifications, contract duration, staffing costs, or pricing mechanisms. (See, e.g., IBM Exs. 10, 23, 24.)

### v. Pricing of Deals

The pricing of outsourcing deals and technology projects is a complicated process.  Each deal is unique.  (Tr. 419:4-5.)  The final price attached to a project results from a detailed analysis of the scope of work and the development of a proposed solution that is unique to each deal.  (Tr. 201:21-202:15, 209:25-210:21, 557:10-558:9.)  In the case of an SO deal, the cost to run the service for the client is also included.  (Tr. 425:24-426:4.)  Mr. Visentin had no responsibility for pricing SO deals (Tr. 426:20-427:4, 208:3-10) and did not have the ability to price any deal.  (Tr. 414:22-421:9.)

vi. Troubled IBM Clients

As part of his ITS responsibilities, Mr. Visentin was privy to discussions regarding some "troubled" clients.  IBM admitted that (1) some of IBM's troubles with clients are publicly known and reported in the media or already known to HP through existing relationships with those clients (Tr. 214:10-215:3, 220:4-222:8); and (2) most of IBM's troubled clients are in the early stages of long-term contracts with IBM that are not up for renewal or competitive bidding in the next 12 months (Tr. 222:9-14).  Mr. Visentin was only aware of ITS's troubled clients at a general, service product line level.  (Tr. 443:24-444:24.)

vii. Knowledge of Potential IBM Acquisition

Mr. Visentin was not responsible for making acquisitions while at IBM and will not have any responsibility for making acquisitions at HP.  Mr. Visentin acknowledged that he is aware of a potential acquisition by IBM and that he is subject to an independent nondisclosure agreement with regard to a potential IBM acquisition.  (Tr. 474:4-475:15.)

II.  Discussion

a. Preliminary Injunction Standard

A preliminary injunction is "an extraordinary and drastic remedy which should not be routinely granted." Med. Soc'y of State of N.Y. v. Toia, 560 F.2d 535, 538 (2d Cir. 1977); see also Hanson Trust PLC v. SCM Corp., 774 F.2d 47, 60 (2d Cir.

16

1985) (preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies"); Int'l Creative Mgmt., Inc. v. Abate, No. 07 Civ. 1979, 2007 WL 950092, at *2 (S.D.N.Y. Mar. 28, 2007) (same).  To obtain a preliminary injunction, the moving party must demonstrate: "(1) that [it] will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor."  Lusk v. Vill. of Cold Spring, 475 F.3d 480, 485 (2d Cir. 2007) (internal quotation marks omitted).  Furthermore, the Court of Appeals has indicated that where an injunction is mandatory, a movant must demonstrate a substantial likelihood of success on the merits.  See Johnson v. Kay, 860 F.2d 529, 540 (2d Cir. 1988); see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995).  Although the Court believes that this heightened burden should apply in this case, such a distinction is of no consequence here because IBM has failed to carry its burden under the less stringent preliminary injunction standard.

> b. Application to the Present Motion

In the present action, IBM bears the burden of demonstrating that the circumstances of this particular case as it relates to this specific employee warrant such a "drastic

remedy." Many times when litigants seek a preliminary injunction to prohibit the disclosure of trade secrets, a court must rely on somewhat limited information to determine whether the information a party seeks to protect should qualify as "trade secrets." By way of contrast, this Court presided over an exhaustive four-day hearing, part of which was conducted in a closed courtroom to protect the confidentiality of what were said to be "highly sensitive" IBM documents. In deciding this motion for a preliminary injunction, the Court has the full benefit of examining all the documents at issue and hearing testimony from several IBM representatives who were invited to explain to this Court with specificity the precise information at issue and the impact that potential disclosure would have on IBM. For the reasons discussed below, IBM has failed to carry its burden of demonstrating that the facts of the present case warrant granting the extraordinary relief requested.

> i. Irreparable Harm

A demonstration of irreparable harm is the "most important prerequisite for the issuance of a preliminary injunction." Bell & Howell v. Masel Supply Co., 719 F.2d 42, 45 (2d Cir. 1983). "The mere possibility of harm is not sufficient: the harm must be imminent and the movant must show it is likely to suffer irreparable harm if equitable relief is denied." See Earthweb Inc. v. Schlack, 71 F. Supp. 2d 299, 308 (S.D.N.Y.

1999) (citing JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75,
79 (2d Cir. 1990)).  "To make this showing, a Plaintiff must
demonstrate that absent a preliminary injunction he will suffer
'an injury that is neither remote nor speculative, but actual
and imminent,' and one that cannot be redressed through a
monetary award."  Payment Alliance Int'l, Inc. v. Ferreira, 530
F. Supp. 2d 477, 480 (S.D.N.Y. 2007) (quoting Grand River Enter.
Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007)).  If
irreparable harm is remote, speculative, or a mere possibility,
the motion must be denied.  See Borey v. Nat'l Union Fire Ins.
Co., 934 F.2d 30, 34 (2d Cir. 1991); Reuters Ltd. v. United
Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990).  "In non-
compete cases, such as this one, the irreparable harm analysis
and the likelihood of success on the merits analysis are closely
related and often conflated."  IBM Corp. v. Papermaster, 08 Civ.
9078, 2008 WL 4974508, at *7 (S.D.N.Y. Nov. 21, 2008) (internal
quotation marks omitted).  Here, IBM argues that it will be
irreparably harmed because Mr. Visentin's proposed position at
HP poses the risk that he will inevitably disclose confidential
information that he learned at IBM.[4]

---

[4] IBM also asserts that by signing the noncompetition agreement,
Mr. Visentin "acknowledged and agreed that IBM would 'suffer
irreparable harm' if he failed to comply with the Noncompetition
agreement." (IBM's Memorandum of Law in Support of Its
Application for a Temporary Restraining Order and Motion for a
(cont'd on next page)

At oral argument, IBM suggested that the heightened standard for mandatory injunctions should not apply because "the fact that [Mr. Visentin] was able to get on the [HP] payroll was a function of their giving no notice and jumping the gun, which only gave us 24 hours to get an injunction." (Tr. 686:9-11.) In fact, however, in his resignation letter, Mr. Visintin stated that "he would be willing to consider a mutually agreeable continuation of [his] employment for a limited period of time if [IBM] would like [him] to assist in the transition of [his] responsibilities." (IBM Ex. 192.)  But IBM rejected that offer, sending someone to Mr. Visentin's house within hours to collect his laptop. (Visentin Decl. ¶ 35; Tr. 687:5-8.)  Thus, it was IBM that changed the status quo, leading to its seeking a mandatory injunction.

---

(cont'd from previous page)
Preliminary Injunction at 13.)  IBM, however, did not address this argument during testimony or oral argument.  Furthermore, parties to a contract cannot, "by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate." Fireman's Ins. Co. of Newark v. Keating, 753 F. Supp. 1146, 1154 (S.D.N.Y. 1990).  Indeed, a contract provision does not, as a matter of law, constitute conclusive evidence that irreparable harm has occurred.  Int'l Creative Mgmt. v. Abate, No. 07 Civ. 1979, 2007 WL 950092, at *6 (S.D.N.Y. Mar. 28, 2007).  The significance of this provision is also diminished by the fact that there was no meaningful negotiation regarding any of the terms of the noncompetition agreement.  (Tr. 577:22-578:5, 592:24-593:7.)

1. Trade Secrets

New York law governs the noncompetition agreement at issue. (IBM Ex. 1, § 13; IBM Ex. 3, § 15.)  In New York, properly scoped noncompetition agreements are enforceable to protect an employer's legitimate interests so long as they pose no undue hardship on the employee and do not militate against public policy.  See BDO Seidman v. Hirshberg, 712 N.E.2d 1220, 1223 (N.Y. 1999).  Trade secrets and confidential information count among employer interests courts recognize as "legitimate." Reed, Roberts Assocs., Inc. v. Strauman, 353 N.E.2d 590, 593 (N.Y. 1976).  Only that confidential information or those trade secrets that the employee misappropriates or will inevitably disclose is protectable.  See id. (recognizing that enforcement of noncompetition agreements allows employer to "protect himself against deliberate surreptitious commercial piracy"); see also N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999); PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1268 (7th Cir. 1995).

New York courts define a "trade secret" as "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." N. Atl. Instruments, 188 F.3d at 44 (internal quotation marks omitted); accord Ashland Mgmt. Inc. v. Janien, 624 N.E.2d 1007,

21

1012-13 (N.Y. 1993) (citing Restatement of Torts § 757 cmt. b (1939)).  "A trade secret once lost is, of course, lost forever and, therefore, such a loss cannot be measured in money damages." Estee Lauder Cos. v. Batra, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (internal quotations omitted); accord Papermaster, 2008 WL 4974508, at *7; Destiny USA Holdings, LLC v. Citigroup Global Mkts. Realty Corp., 889 N.Y.S.2d 793, 800 (N.Y. App. Div. 2009).  Courts consider the following factors when determining whether certain information constitutes a trade secret:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

N. Atl. Instruments, 188 F.3d at 44; Ashland Mhmt., 624 N.E.2d at 1013.

At IBM, Mr. Visentin's primary job was to be a "general manager."  Although trade secrets may have lurked somewhere on the periphery, the real thrust of his position was to manage his teams to make them as efficient as possible.  Mr. Visentin testified that he had never taken a computer science course (Tr. 348:23-24), described himself as a generalist, and noted, "I am

not technical, I don't know the details of offerings, I'm more
of a general manager and I run a business." (Tr. 461:21-
461:23.)  In describing his approach to his job, Mr. Visentin
testified:

> I'm a business unit executive, so I run the P&L in
> terms of understanding profit, revenue, and signings.
> I focus in on transformation on people.  I'm a big
> believer if you get the right leaders, the right
> people in place, you put the right processes in place
> for them, they are able to execute and you give them
> as much economy as possible to execute.
>       My strength is not giving them technical
> knowledge.  It's really understanding.  I call it
> pulling the string theory. . . .  It's my
> understanding, when a client asks for something, who
> in your organization is doing the work and why and are
> there steps in there that you could improve, are there
> processes you could improve to make it more effective
> so you could possibly take cost out and give a better
> response to clients.

(Tr. 425:2-15.)  Mr. Visentin testified further:

> My strength is to assure that I put a right team in
> place, that I have them all rowing in the same
> direction.  That is my strength.  That is called
> transformation.  What people to put on which project,
> I don't have that knowledge.  Depending on the
> project, it depends what type of technical skills you
> would need.

(Tr. 430:22-431:4.)  This testimony was uncontested.

Mr. Tom Iannotti, Mr. Visentin's future manager at HP,
confirmed that these generalist qualities were the driving
factor behind HP's hiring of Mr. Visentin.  Mr. Iannotti
testified that he hired Mr. Visentin because "[h]e had good
general IT services knowledge, broad experience.  He struck me

as a process-oriented thinker, a guy who could sort of connect the dots, if you will, of the overall responsibilities of the job." (Tr. 541:20-25.)  Mr. Iannotti further testified that he did not need someone with technical proficiency in cloud or other technical services because that was not part of Mr. Visentin's new job.  (Tr. 543:13-544:24.)  Instead, Mr. Visentin's job at HP will be "to manage people."  (Tr. 546:16-21.)  HP does not expect Mr. Visentin to be involved in the pricing, design, or staffing of new business.  (Tr. 555:1-16.)  Nor will Mr. Visentin be involved in pricing generally.  At HP, pricing is a highly specialized task performed by a team of experts.  (Tr. 557:12-25.)

IBM, however, has identified numerous general types of information potentially in Mr. Visentin's possession it claims should be afforded protection.  This information includes strategic business and marketing plans contained in documents like the Fall 2011 ITS Plan, strategic initiatives in cloud computing, new service offerings, acquisition plans, the operational finances of ITS, IBM's competitive business and pricing strategies, the identity of new client targets and pipeline information, the identity of troubled accounts, and IBM's competitive strategies to attack HP.  A number of these areas overlap.  Moreover, many of these purported areas of "trade secrets" also appear to include information that is

24

either applicable to all large corporations, in the public
domain, or outdated.

In a majority of the areas of information that IBM now
seeks to protect as "trade secrets," IBM's fact witnesses, Mr.
Patrick Kerin and Ms. Emily McCabe, failed to provide specific
examples of confidential or trade secret information that could
actually be used to IBM's detriment if Mr. Visentin were allowed
to assume his new position at HP.  IBM did, however, demonstrate
two areas – a potential IBM acquisition and client pipeline
information – that may warrant protection as trade secrets.
Below, the Court addresses each type of information identified
by IBM.

a. I&VT Meetings

IBM asserts that Mr. Visentin possesses confidential IBM
information that he learned by attending I&VT meetings in 2009
and 2010.  As Mr. Kerin testified, however, Mr. Visentin
resigned prior to the 2011 I&VT meeting and had not attended an
I&VT meeting since January of 2010, more than a year before he
resigned.  (Tr. 56:23-58:7.)  Additionally, the Court credits
Mr. Visentin's testimony that he did not recall any specific
details from those meetings.  (Tr. 273:18-275:2.)  Therefore,
IBM is not in danger of his revealing such details.

Further, Mr. Randy MacDonald, IBM's Senior Vice President
for Human Resources, stated that from 2005 through 2009, some

25

members of the I&VT were not required to sign noncompetition
agreements, despite being privy to precisely the same purported
trade secrets and confidential information to which Mr. Visentin
was exposed.  (Tr. 585:15-586:4.)  This cuts against IBM's
assertion that the information discussed at I&VT meetings rises
to the level of a trade secret.  Finally, despite being asked
directly by the Court to provide specific information that IBM
was concerned Mr. Visentin would disclose to HP, none of IBM's
witnesses identified any specific information shared with I&VT
members in January 2010 that would be harmful if disclosed to HP
in 2011.  (See Tr. 625:17-628:21.)  Accordingly, IBM has not
demonstrated the existence of a trade secret in need of
protection in this area.

                    b. I&VT Task Force on Business Analytics

     In 2010, Mr. Visentin participated in a Task Force that
examined IBM's Business Analytics initiative.  Mr. Kerin
testified, however, that (1) HP did not compete in the Business
Analytics area; (2) he had not read any media reports indicating
that HP was entering the business analytics area; (3) IBM's
competitive analysis of HP did not suggest that HP was investing
in or selling business analytics; and (4) Mr. Visentin would not
need to know anything about Business Analytics at IBM in order
to perform the position he accepted at HP.  (Tr. 181:2-22.)
Further, the Court credits Mr. Visentin's unrebutted testimony

that (1) he did not possess any documents relating to his work on the Business Analytics Task Force and (2) he did not have access to any such documents. (Tr. 374:17-23.) Accordingly, IBM has not demonstrated the existence of a trade secret in need of protection in this area.

### c. Cloud Computing

IBM expressed much concern about the secrecy of its cloud computing offerings. Indeed, when given numerous opportunities to describe the concerns it had about specific confidential information Mr. Visentin might possess, IBM returned repeatedly to Mr. Visentin's purported possession of IBM's confidential cloud information. However, Mr. Kerin, Mr. Visentin's former manager at IBM, admitted that Mr. Visentin was not one of his top cloud computing employees (Tr. 190:4-24), and Mr. Visentin's name was not on the list of the top 30 cloud people at IBM. (Id.; IBM Ex. 18 at 6.) Additionally, the Court credits Mr. Visentin's testimony that he could not describe the architecture or design of cloud (Tr. 356:10-13) and that he has never discussed cloud with anyone at HP (Tr. 334:23-335:8).

With regard to Mr. Visentin's knowledge of IBM's cloud computing information, Mr. Kerin was questioned specifically about what information regarding IBM's cloud computing offerings he was concerned Mr. Visentin had in his memory and that he might reveal to HP. In response, Mr. Kerin provided only very

general information.  (*E.g.*, Tr. 185:19-23 ("[Mr. Visentin]
knows that we've stood up infrastructure in various parts of the
country that are costing us upwards of $5 million in any given
period, and that we have significant objectives underway right
now to try to build out clients on that capacity.").)  Indeed,
when pressed, Mr. Kerin was unable to identify any specific
information regarding cloud computing in Mr. Visentin's
possession that could cause competitive harm to IBM.  (Tr.
185:16-190:5. ("Q: If [Mr. Visentin] were to tell HP, IBM's
invested millions of dollars in hardware, software . . .to make
cloud work, you believe that would cause competitive harm to IBM
and that it would disclose information that HP doesn't already
know?  A: No, I don't. . . .  Q: What does he know about [IBM's
cloud investment]?  A: He knows what it is, sir.  Q: Tell us
what it is. . . .  A: It is a level of detail which he knows
better than I . . . .  We just trained our field on this in the
fourth quarter . . . .").)  Additionally, although both Ms.
McCabe and Mr. Kerin claimed that Mr. Visentin would know IBM's
"public cloud pricing," Mr. Kerin admitted that he himself did
not know that pricing off the top of his head and that he did
not know whether Mr. Visentin would be able to remember any such
pricing information.  (Tr. 185:2-15.)  In any event, the Court
credits Mr. Visentin's uncontested testimony that he could not
recall any pricing information for any of IBM's services,

including cloud offerings.  (Tr. 462:10-16 ("I could not possibly remember the cost or the price of . . . at least 180 offerings or the deals, so, no, I don't.").)

Furthermore, IBM admits that it is a latecomer to the public cloud arena and that the market price has already been set by Amazon.com and Google.  (Tr. 520:13-24.)  Ms. McCabe testified that "[p]ublic cloud is such that companies like Amazon and Google are already out in the marketplace and they establish a market price level.  So, often when you want to get into the business and you're late, you have to inherit the price that everybody else is selling it for."  (Id.)  In closing arguments, IBM's counsel clarified that because of Amazon and Google, "[t]he pricing is already there and everybody wants to drive down their costs."  (Tr. 655:19-21.)  Therefore, IBM – or, seemingly, HP and anyone else in the business – would have little room to maneuver on pricing.  In the broadest business terms, any competitor's only option to improve profits is to reduce its costs, but profit is the goal of any company investing in new technology.  This is hardly the stuff of trade secrets.

IBM also asserts that the cost of IBM's cloud infrastructure would have appeared on the profit and loss statements for which Mr. Visentin was responsible.  (Tr. 520:10-12.)  But there is no evidence in the record that Mr. Visentin

29

was aware of anything other than the overall cost of IBM's cloud offerings.  As an example, assuming, hypothetically, that Mr. Visentin may have been aware that IBM had invested in servers to support its cloud offerings, IBM has offered no testimony that Mr. Visentin was aware of the type or number of servers used by IBM, their capabilities or any other specifics.[5]  IBM has failed to demonstrate how, absent any indication that Mr. Visentin possessed more specific knowledge of the underlying data, Mr. Visentin's supposed recollection of the overall cost of IBM's cloud investment can be of any use to a competitor and thus that it constitutes a trade secret in need of protection.

Ms. McCabe also expressed concern that Mr. Visentin might possess confidential IBM knowledge regarding a new cloud product offering.  (Tr. 512:14-513:15.)  Despite being given the chance, however, Ms. McCabe failed to provide any details about this new offering.  (Tr. 512:14-517:13 ("Q: Can you please explain, again

_____

[5] The Court finds the analogy of Mr. Visentin's counsel persuasive:

> [C]loud is not a product.  It's not like the tie that I'm wearing, your Honor, where you might say, all right, the company produces 3000 of these ties, it costs $18.75 to make, we sell it for $55.  That's useful to a competitor to know.  Cloud is a continuum of services based on a specific solution to enable companies to do their computer processing in multiple ways.  So there is no price or cost to know.

(Tr. 650:1-7.)

30

without mentioning the product, what happened with that product?
A: This was a product that we had originally intended to deliver
to the marketplace quickly because we felt that it was an area
that was going to have a lot of market interest.  We had some
technical problems with the offering.  So we, in fact, had to
move the availability date, and in fact the announce date, out
well beyond what we had expected. . . .  [Mr. Visentin] was in
the same group of individuals who understood the updates to what
was happening from a product standpoint and then could help
determing what's the next phase of development.").)  She
similarly failed to establish what knowledge Mr. Visentin would
have regarding the offering, stating only that he had "exposure"
to it and that Mr. Visentin was "on the distribution [list]."
(Tr. 513:13-23, 516:23-517:2.)  Absent more, the Court is not
persuaded that simply being on an email distribution list about
a new product offering means that Mr. Visentin has any lingering
knowledge of it.  This is particularly so given that cloud
computing is a continuum of services, some generic, some highly
specialized for the particular client.  Further, Ms. McCabe
offered only speculative and generalized testimony regarding
what competitive harm, if any, IBM would suffer if information
regarding the new cloud product offering became known to a
competitor.  (Tr. 515:23-516:22, 517:3-13.)  Accordingly, IBM

31

has not demonstrated the existence of a trade secret in need of
protection in this area.

                  d. New Service Offerings Other Than Cloud

IBM also initially expressed concern that Mr. Visentin
might possess knowledge of new service offerings IBM currently
has in development.  When the Court asked IBM to discuss with
specificity the offerings that it was concerned about, IBM
identified only its cloud offerings.  But as indicated above,
testimony on that topic was not persuasive, and, thus, IBM has
not demonstrated the existence of any trade secrets in need of
protection in this area.

                  e. Potential Acquisition Target

In her testimony, Ms. McCabe also expressed concern that
Mr. Visentin possesses confidential IBM knowledge regarding a
potential IBM acquisition target.  (Tr. 517:22-519:17.)  As
noted above, Mr. Visentin acknowledges that this information is
a trade secret and that he was already subject to an independent
nondisclosure agreement with regard to a potential IBM
acquisition.  (Tr. 474:4-475:15.)  The Court credits his
testimony that he would never reveal the identity of the
acquisition to HP.  (Id.)  Mr. Visentin was not responsible for
making acquisitions while at IBM, and he will not have any
responsibility for making acquisitions at HP.  IBM did not
present any persuasive evidence to suggest that Mr. Visentin

would disclose or be required to disclose any information regarding IBM's potential acquisition in order to do his job at HP.

### f. Client Pipelines

IBM asserts that Mr. Visentin had access to confidential pipeline information.  Mr. Visentin confirmed that he had access to general pipeline information; several exhibits indicated that at various meetings, Mr. Visentin might have seen the name of a client and the total dollar value of a prospective deal.  To the extent that it is not public or not known in the industry, this information might well constitute a trade secret.  The Court, however, credits Mr. Iannotti's testimony that simply knowing the client and the projected amount of the deal would not tell Mr. Visentin anything about the scope of services to be provided, the length of the contract, the cost to IBM, or the nature of the solution itself.  (Tr. 556:14-557:9.)  IBM has not demonstrated that, absent such additional detail, general pipeline information would be useful to a competitor.

Additionally, Mr. Kerin testified that most large SO deals were either single-source arrangements (mostly renewals) where competitive bids were not being considered or were the product of detailed requests for proposals ("RFPs") that generated responses consisting of hundreds of pages.  (Tr. 195:10-203:9.) Mr. Visentin did not receive RFP responses and would not know

33

the details of such proposals.  (Tr. 201:25-202:11.)  As for the
high-level information about SO pipelines Mr. Visentin may have
seen, Mr. Kerin conceded that HP is usually a bidder on such
RFPs anyway, so the disclosure of the identity of the potential
client is not much of a revelation.  (Tr. 200:21-25.)  Finally,
and most importantly, Mr. Kerin admitted that even if a
prospective client is not already known to HP, Mr. Visentin's
generalized knowledge of that opportunity poses no threat to IBM
if he simply refrains from disclosing that knowledge to HP (Tr.
198:4-200:5) – an obligation he recognizes.  (Tr. 293:23-294:7,
474:25-475:10.)  Accordingly, at most, IBM has demonstrated the
possibility of some confidential information that Mr. Visentin
acknowledges he will not disclose and which, as explained infra,
he does not have to disclose to do his job.

> g. Strategic Business and Marketing Plans

IBM argues that Mr. Visentin possesses knowledge of its
strategic business and marketing plans. Such "marketing
strategies," however, are not necessarily protected as "trade
secrets" under New York law.  See Marietta Corp. v. Fairhurst,
754 N.Y.S.2d 62, 67 (N.Y. App. Div. 2003) (concluding that
"pricing data and market strategies . . . would not constitute
trade secrets"); see also Silipos, Inc. v. Bickel, 06 Civ. 2205,
2006 WL 2265055, at *4 (S.D.N.Y. Aug. 8, 2006) ("[T]rade-secret
protection does not extend to information regarding market

34

strategies." (internal quotation marks omitted)).  IBM also
asserts that Mr. Visentin was responsible for creating and
presenting the Fall Plan for ITS for 2011.  But when questioned
about the specific information contained in the plan that was
cause for concern, IBM first referred back to its cloud
offerings.  (Tr. 641:6-8.)  As previously determined, IBM has
not carried its burden of indicating what information Mr.
Visentin possesses regarding IBM's cloud offerings that would
likely be considered a trade secret.  IBM also suggested that
the Fall Plan contained information that IBM's business
continuity and recovery systems segment "had been slipping
historically."  (Tr. 641:11-13.)  But IBM did not offer any
evidence to demonstrate how that information might be useful to
HP.  Even assuming that Mr. Visentin could recall all the data
in the Fall Plan – a dubious assumption in light of the detail
contained therein (see IBM Ex. 39) - IBM has again failed to
provide any indication as to how Mr. Visentin could use that
information in his new position for HP.  Thus, it has not
demonstrated the existence of a trade secret in need of
protection in this area.

### h. Operation Finances of ITS

IBM asserts that as the head of ITS in North America, Mr.
Visentin was responsible for the "pricing and cost structure" of
his business.  (Tr. 42:24-43:5.)  But New York courts have held

that "knowledge of the intricacies of [a] business operation"
are not entitled to protection as "trade secrets."  See, e.g.,
Reed, Roberts, 353 N.E.2d at 594 (absent wrongdoing, employee
should not "be prohibited from utilizing his knowledge and
talents" in a specific area); Marietta Corp., 754 N.Y.S.2d at
67; Meer Dental Supply Co. v. Commisso, 702 N.Y.S.2d 463, 465
(N.Y. App. Div. 2000).  Also, as discussed supra in Part I.g.v.,
in general, each deal is unique, and the pricing and cost
structure of one deal have little to do with the next deal.
Also as discussed infra, Mr. Visentin has not been involved in
pricing and cost structuring at IBM and will not be at HP.
Accordingly, IBM has not demonstrated the existence of a trade
secret in need of protection in this area.

i. Pricing Strategies

IBM asserts that Mr. Visentin knows the confidential
details of one of IBM's competitive strategies; specifically,
the ability to reduce prices and increase profits on the ITS
component of combined outsourcing bids.  (Tr. 432:18-433:5.)
The pricing of outsourcing deals and technology projects,
however, is a complicated process, and the final price attached
to a project results from a detailed analysis of the scope of
work and the development of a proposed solution that is unique
to each deal.  (Tr. 201:21-202:15, 209:25-210:21, 557:10-558:9.)
The Court credits Mr. Visentin's testimony that he had no

36

responsibility for pricing SO deals, which Mr. Kerin conceded.
(Tr. 426:20-427:4, 208:3-10.)

The Court further credits Mr. Visentin's testimony that to
the extent he became involved in the ITS pricing and development
processes at all, he did so only as "the stripe," i.e., as an
executive level manager who could provide a high-level
description of services and then interact with the client, if
necessary. (Tr. 421:23-422:23.)  Mr. Visentin testified that he
did not have to approve the price of an ITS component of an SO
deal unless it was expected to yield a "negative profit" for his
group. (Tr. 353:23-354:17, 423:12-424:4.)  The Court credits
Mr. Visentin's testimony that in the normal course, pricing was
handled by his teams. (Tr. 426:20-427:3.)  These projects
required dozens or even hundreds of employees of varying
technical skills, extensive hardware, and countless other pieces
that had to be priced separately before an aggregate price was
delivered, and Mr. Visentin was not provided with such
underlying cost or pricing information. (Tr. 421:23-424:4,
426:4-427:5.)

The Court also credits Mr. Visentin's unrebutted testimony
that he would be unable to price even a small ITS project, let
alone a larger SO deal. (Tr. 414:22-421:9.)  According to Mr.
Visentin, the major components affecting the cost of any ITS
deal are labor and hardware, and the team architects and

37

consultants are responsible for making those determinations. The Court credits Mr. Visentin's testimony that he would be unable to make those determinations. (Tr. 412:14-413:25.) Indeed, Mr. Visentin testified that he does not know the 180 offerings sold by ITS and could not possibly remember the cost or price of those offerings. (Tr. 462:10-16.) Moreover, the Court credits Mr. Visentin's testimony that he does not remember the pricing margin IBM sought on its deals and, even if he could, the margin is based on the overall business, which is made up of thousands of deals. (Tr. 462:17-464:18.) ITS priced its projects higher on some deals and lower on others, often depending on how the projects were packaged as part of much larger SO deals. "So even if [he] would remember the fact that [business continuity and recovery systems], they want to do this margin, it won't help you in the deal-to-deal combat with the client." (Tr. 464:1-3.) Finally, the Court credits Mr. Iannotti's testimony that HP employs a specialized pricing team to price ITO projects and that Mr. Visentin would have no responsibility for pricing at HP. (Tr. 555:1-3, 557:10-558:9.) Accordingly, IBM has not demonstrated the existence of any trade secret in need of protection in this area.

### j. Troubled Clients

IBM asserts that Mr. Visentin possesses confidential IBM information regarding troubled clients. (Tr. 152:9-153:2.) As

38

noted above, Mr. Kerin conceded, however, that many of IBM's
troubled clients are already known to HP because HP has existing
relationships with those clients or because IBM's troubles with
clients are publicly known and reported in the media.  (Tr.
214:10-215:3; 220:4-222:8.)  Furthermore, as also noted, a
majority of the troubled clients identified by Mr. Kerin are in
the early stages of what are generally five-year contracts and
will not be up for renewal in the next twelve months. (Tr.
222:9-14.)  Indeed, some of those troubled contracts came to IBM
because the client was having issues with its former provider,
HP.  The Court credits Mr. Visentin's testimony that he was only
aware of ITS's troubled clients at a general, service product
line level.  (Tr. 443:24-444:24.)  The Court also credits Mr.
Visentin's testimony that "every deal is different.  It's really
understanding what went wrong in the deal."  (Tr. 448:15-25.)
Furthermore, Mr. Visentin already has agreed that he will not be
responsible for any new or renewal clients in ITO North America.
Accordingly, IBM has not demonstrated the existence of any trade
secret in need of protection in this area.

> k. IBM Strategies to "Attack HP"

Finally, IBM asserts that Mr. Visentin was privy to
internal IBM briefings about HP, its service offerings, and
IBM's perception of HP's strengths.  The Court finds that IBM's
strategies to "attack" HP, however, are based largely on public

39

information and information shared by clients that chose HP over IBM; presumably, that information is available to HP as well. (IBM Ex. 10 at 7; IBM Ex. 23 at 5-6.)  IBM asserts that ITS also tracked its "win rate" against HP and discussed "lessons learned" from head-to-head competition with HP.  It is undisputed, however, that HP and IBM already have a great deal of competitive intelligence regarding one another and that such information is readily available in the marketplace for technology services and outsourcing.  There is no evidence that IBM's acknowledgement of losses to HP that HP was surely aware of would be of use to Mr. Visentin in his new position. Finally, despite the supposed confidentiality of the documents (IBM Exs. 10, 15, 23) and the closing of the courtroom during the related testimony (see Tr. 320:2-3), the "lessons learned" were largely the equivalent of "buy low, sell high" – hardly a trade secret.

In sum, after carefully considering all testimony and documents presented during the hearing, IBM has not carried its burden of demonstrating that, with a few exceptions which Mr. Visentin acknowledges, the information which IBM seeks to protect constitutes "trade secrets."

## 2. Inevitable Disclosure

That Mr. Visentin had access to some confidential information is not sufficient to show irreparable harm.  The

40

Court must still determine whether Mr. Visentin has actually misappropriated those trade secrets or if his new position will inevitably require disclosure of those same trade secrets or confidential information.  See Estee Lauder, 430 F. Supp. 2d at 179.

Here, it is undisputed that Mr. Visentin did not leave IBM with any documents in any form and that Mr. Visentin has not yet begun to work for HP.  Indeed, only hours after notice of his intent to resign, IBM sent a representative to Mr. Visentin's home to retrieve his laptop.  (Visentin Decl. ¶ 35.)  Thus, there is no showing that Mr. Visentin has actually misappropriated any trade secrets.

Recognizing that there was a potential risk with regard to Mr. Visentin's prior clients at IBM, Mr. Visentin and HP agreed to limit the scope of Mr. Visentin's responsibilities for the first twelve months of his employment with HP as noted above. IBM argues in response that it is inevitable that Mr. Visentin will disclose trade secrets in his new position with HP, but the Court is not persuaded.

When determining whether the disclosure of trade secrets is inevitable, courts evaluate certain factors, including:

> (1) the employers in question are direct competitors
> providing the same or very similar products or
> services; (2) the employee's new position is nearly
> identical to his old one, such that he could not
> reasonably be expected to fulfill his new job

responsibilities without utilizing the trade secrets
of his former employer; and (3) the trade secrets at
issue are highly valuable to both employers. Other
case-specific factors such as the nature of the
industry and trade secrets should be considered as
well.

EarthWeb, Inc., 71 F. Supp. 2d at 310.

IBM asserts that Papermaster and Estee Lauder should inform
the Court's decision here.  The facts of those cases, however,
are quite distinct from the facts here.  In Papermaster, the
employee was a former IBM Vice President with highly technical
expertise and knowledge of IBM's "power architecture" trade
secrets and had worked on microprocessors.  2008 WL 4974508 at
*2.  He was recruited away from IBM specifically to manage the
development of consumer electronics products for a competitor in
the field of microprocessor technology.  Id. at *5.  The court
described Papermaster as IBM's "top expert in the development
and application" of the technology at issue.  Id. at *2.  The
court found that because the employee's ultimate task at the new
employer was to make its microprocessors more efficient, it was
inevitable that he would bring his technological expertise to
bear.  Id. at *8-9.  That is not the case here.  Similarly, in
Estee Lauder, the employee was a marketing strategist
responsible for developing brand strategies behind a line of
cosmetic dermatology skin care products.  430 F. Supp. 2d at
176.  The employee's new position was to be a marketing

strategist for a competitor that also sold cosmetic dermatology skin care products.  The court found that because the employee had been the primary marketing strategist for Estee Lauder and was going to a competitor to do the same type of job for the same type of products, it would have been impossible for the employee to keep the Estee Lauder marketing strategy out of his mind.  Id.  Again, this is quite different from the type of job and information at issue here.

Here, both parties agree that IBM and HP are direct competitors and also agree that the nature of the industry necessarily involves trade secrets.  The remaining two factors, however, heavily weigh in favor of Mr. Visentin.

### a. Near Identity of Positions

As previously noted, one factor that a court must consider when determining whether disclosure of trade secrets is inevitable is whether the employee's new position is "nearly identical" to his previous position.  Id.  It is beyond cavil that in his former position at IBM, neither Mr. Visentin nor anyone on his team had any responsibility for BPO or Applications, as he will in his new HP role (Tr. 358:13-359:6), so there is no overlap at all in those areas.

Mr. Visentin testified that six other general managers were responsible for SO – a parallel group that also reported to Mr. Kerin.  (Tr. 429:2-4.)  Also, Mr. Kerin testified that one calls

on different individuals at the clients for BPO - for example,
the chief information officer who is deciding whether to
outsource the finance or accounting process with IBM or HP – as
opposed to a different individual for ITS.  (Tr. 168:18-169:3.)
Thus, IBM has shown no overlap in this area.

In addition, although there was no specific testimony
offered by IBM as to Latin America, Mr. Visentin was not
responsible for Latin America for the past two years.  Thus, on
its face, Mr. Visentin's new position at HP is not "nearly
identical" because the scope of his new responsibility is
significantly larger and includes areas of supervision, both
substantive and geographic, that he had no prior exposure to in
his position with IBM.

Nevertheless, the Court recognizes that there is the
potential for some identity of responsibilities with respect to
Mr. Visentin's former ITS responsibilities and his new ITO
responsibilities.  In Mr. Visentin's new position, however, ITO
will be one small bite on a much larger plate of responsibility.
By way of example, if the Court were to construct a Venn Diagram
of Mr. Visentin's new and old responsibilities, Mr. Visentin's
new HP ES responsibilities would constitute a significantly
larger circle than his prior IBM responsibilities.  The much
smaller circle representing Mr. Visentin's former IBM ITS
responsibilities would have only slight overlap with the larger

44

ES circle: the ITS-ITO overlap.  Recognizing that there is a
small overlap, however, Mr. Visentin agreed to limit the scope
of his new duties at HP such that his new job – in potential
overlap areas – does not involve prior clients or the potential
for selling new products to current customers.

HP and Mr. Visentin agreed that he will only have full
responsibility for ITO clients in Latin America for his first
year.  Mr. Visentin ceased having any responsibility for IBM's
Latin American ITS clients approximately two years before his
resignation.  To the extent that IBM protests in general terms
that Mr. Visentin's knowledge of its global business strategies
would apply anywhere in the world, the Court finds that argument
to be unpersuasive.  IBM was unable to support its argument with
any specifics as to what IBM strategies – the details, as
opposed to generalities – Mr. Visentin would need to know to run
the Latin American portion of HP's ITO business.  Further,
witnesses from both parties testified that each outsourcing deal
is unique and must be designed in response to factors unique to
a specific client, no matter where the client is located.
Recognizing, however, that some of the services offered by HP's
ITO and IBM's ITS business segments are similar, Mr. Visentin
will be limited for a period of time to working only with
existing HP ITO clients in the United States and Canada.  He

45

will not be involved with new or renewal business opportunities
within ITO during that time.  (Tr. 552:16-22; IBM Ex. 192.)

    IBM asserts that this limitation is unrealistic or
unworkable.  But this ignores the nature of Mr. Visentin's
position as a high-level manager, as opposed to a "front line"
salesperson or technical architect or designer.  The Court
credits Mr. Iannotti's testimony that Mr. Visentin will not be
involved in the staffing, architecture, design or pricing of any
new business opportunity.  (Tr. 553:2-555:16.)  Indeed, Mr.
Visentin testified that his response to an inquiry from a new
client or an existing client seeking to expand its relationship
to include new services would be to "land his team" after an
initial, very general discussion with that client.  (Tr. 422:19-
23.)  His team would then:

> [D]o the assessment, the architect, design, the
> implementation.  They go in with their team and they
> present the whole proposal, because they are the
> subject matter experts.  They are the ones that can
> talk in detail.

(Tr. 422:8-14.)  This testimony was uncontested.  Indeed, this
kind of delegation is precisely how Mr. Visentin ran his
business unit at IBM.  The Court credits his testimony that this
will enable him to stay clear of direct involvement in new or
renewal business opportunities within ITO in the United States
and Canada.  (Tr. 553:2-555:16.)  When asked what he expected
Mr. Visentin to do should a client ask Mr. Visentin about

46

expanding the original outsourcing scope, Mr. Iannotti, who
hired Mr. Visentin and will be his direct superior at IBM,
stated that Mr. Visentin would be expected to "direct the
customer to the assigned salesperson that covers the
account. . . . [H]e would say to the customer, thanks very
much, I need to have our account executive follow up with you to
further qualify your interest or decide what next steps would
be." (Tr. 553:14-554:8; see also Tr. 555:11-16 ("Q: After
telling the customer, 'I'm going to put you in touch with an
account executive,' is there anything else that Mr. Visentin
would have to do on that particular expansion opportunity to
fulfill the responsibilities of the job you created for him?  A:
No.").)  This is the question posed in the inevitable disclosure
cases, and the testimony is unrebutted.

IBM also argues that client forecasts, costs, and cloud
information inevitably will be disclosed because Mr. Visentin
will be "in a position of leadership where there will be
discussions about competing with IBM in cloud" (Tr. 658:13-14)
and because "he is in charge of the business" (Tr. 668:23) and
because "he is going to be in a position of supervising those
people." (Tr. 669:9-10.)  Such general arguments do not counter
the undisputed testimony that Mr. Visentin does not need any of
that information to do his job.

Because the purpose of the "nearly identical" prong is to uncover whether an employee will necessarily draw upon prior protectable information at his new job, these facts, when taken together, persuade the Court that Mr. Visentin's jobs are not "nearly identical." The bulk of Mr. Visentin's new job with HP requires general management skills requiring no confidential information, and the scope of his new position is substantially wider than his prior responsibilities – extending to SO, BPO, and Applications. Because there may be potential overlap with some of his former ITS responsibilities, Mr. Visentin has agreed to limit his responsibilities in these areas, and the evidence suggests that he can do so.[6] See SG Cowen Sec. Corp. v. Messih, 224 F.3d 79, 84 (2d Cir. 2000). Accordingly, IBM has not demonstrated that Mr. Visentin's position at HP is "nearly identical" to his position at IBM.

b. Value of Purported Trade Secrets to HP

As previously noted, in seeking a preliminary injunction, IBM bears the burden of proving its case. IBM asserts that it

---

[6] IBM relies on Lumex, Inc. v. Highsmith for the proposition that an agreement not to disclose trade secrets is insufficient. 919 F. Supp. 624, 631 (E.D.N.Y. 1996). However, that case involved an employee with detailed product information central to both the employer's and the competitor's operations. Id. at 625. Given the Court's finding that Mr. Visentin had only certain, circumscribed pieces of confidential information, this reasoning is inapposite to this case because he is capable of refraining from disclosure. See SG Cowen, 224 F.3d at 84.

48

need not prove with specificity how Mr. Visentin might use IBM's purported trade secrets in his new job. While the Court agrees that IBM need not demonstrate exactly how Mr. Visentin might use such information at his new job, IBM does bear the burden of demonstrating that the nature of Mr. Visentin's job makes it "inevitable" that he will disclose IBM "trade secrets." IBM has failed to satisfy that burden.

Mr. Visentin admits that he is bound by law not to disclose IBM's confidential information. (Tr. 293:23-294:7, 474:25-475:10.) Furthermore, Mr. Visentin has agreed to circumscribe the nature of his responsibilities at HP. In response, IBM contends that due to the nature of the competition between IBM and HP, it is inevitable that Mr. Visentin will be "motivated" to disclose IBM's confidential information. As noted above, IBM has failed to demonstrate any likelihood of inevitable disclosure. Also, unlike in Estee Lauder, there is no evidence of any prior wrongdoing or that Mr. Visentin has already disclosed confidential information to HP. See 430 F. Supp. 2d at 176. In essence, IBM asks this Court to find that despite Mr. Visentin's representations, he will eventually be "motivated" to break the law.

When looking at specific areas of concern, again the Court is not persuaded that the nature of Mr. Visentin's new job with HP would require him to use IBM's confidential information. For

49

example, with respect to profit margin, Mr. Visentin testified
that he could not make use of IBM's desired profit margins at
HP.  First, he could not remember all the deals because he
possesses no documents.  (Tr. 463:17-20.)  Second, as Mr.
Visentin described, the overall profit margin "won't help you in
the deal-to-deal combat with the client - because I have the
flexibility of going negative on a deal and then I have the
flexibility of making more profit on another deal."  (Tr. 464:3-
7.)  Third, profit is based in part on cost, and Mr. Visentin's
design teams and architects – not Mr. Visentin himself - were
and will be responsible for determining cost.  Mr. Visentin
explained that if HP has a different cost structure, it would
scope things differently with different tools, and the cost
would be different.  (Tr. 463:13-464:17.)  Given the
differences, the Court credits Mr. Visentin's testimony that he
would not know what to do with IBM's profit margin information
at HP.

     With respect to pipeline information, Mr. Visentin made
clear that his group was responsible for approximately 5000 -
9000 deals per quarter and that he could not possibly remember
them all.  Even if he could, new deals in the pipeline are
confidential.  Furthermore, as previously discussed, Mr.
Visentin will not have any responsibility for new clients and
his new job will not require him to get involved in discussions

of new business.  (Tr. 554:14-23.)  Thus, IBM has not
demonstrated that, under these facts, any confidential
information Mr. Visentin retains will be of value to HP.

Accordingly, the Court concludes that IBM has also failed
to demonstrate facts sufficient to demonstrate that Mr.
Visentin's position at HP would require him to disclose any
confidential IBM information he might remember.

ii. Likelihood of Success on the Merits

IBM seeks specific enforcement of the Noncompetition
Agreement as written.  (Plaintiff's Supplemental Post-Hearing
Proposed Findings of Fact and Conclusions of Law ¶ 13; see also
Tr. 710:15-711:4 (indicating that IBM is not asking Court to
"blue pencil" the agreement).)  To determine whether a
noncompetition agreement is specifically enforceable, New York
courts have adopted the prevailing common law reasonableness
standard.  BDO Seidman, 712 N.E.2d at 1223; see also Ticor Title
Ins. Co. v. Cohen, 173 F.3d 63, 70 (2d Cir. 1999).  The New York
Court of Appeals expounded the reasonableness standard as
follows:

> The   modern,   prevailing   common-law   standard   of
> reasonableness for employee agreements not to compete
> applies  a  three-pronged  test.   A  restraint  is
> reasonable  only  if  it:  (1)  is  no greater  than  is
> required for the protection of the legitimate interest
> of the employer, (2) does not impose undue hardship on
> the employee, and (3) is not injurious to the public.

<u>BDO Seidman</u>, 712 N.E.2d at 1223 (emphasis in original).  In applying this standard, "[c]ourts must weigh the need to protect the employer's legitimate business interests with the employee's concern regarding the possible loss of livelihood, a result strongly disfavored by public policy in New York."  <u>Estee Lauder</u>, 430 F. Supp. 2d at 177 (citation omitted).  "A violation of any prong renders the covenant [not to compete] invalid." <u>BDO Seidman</u>, 712 N.E.2d at 1223.

The Court thus evaluates each of the three prongs in order to determine whether IBM has carried its burden to demonstrate that it has a likelihood of success on the merits.

1. Whether the Agreement Is Greater Than
Necessary to Protect a Legitimate Interest

First, IBM has not demonstrated that the agreement is no greater than required for the protection of its legitimate interests.  At first blush, the agreement is overbroad because it prohibits competition in areas where IBM simply has no legitimate business interest.  <u>See</u> <u>id.</u> (agreement must be "no greater" than necessary to protect legitimate interest).  For example, it prohibits Mr. Visentin from working for a competitor in a business in which IBM does not even participate – for example, retail laptop and printer sales.  (Tr. 582:15-583:16.) Furthermore, as discussed in detail above, it has been established that there are areas of Mr. Visentin's new position,

such as BPO and Applications, that are unrelated to what he did
for IBM; as such, he cannot possess information he could
misappropriate in those areas.  The agreement also prohibits Mr.
Visentin from owning even one share of stock in a competitor.
(Id.)  These broad prohibitions are facially overbroad because
they are greater than necessary to protect IBM's legitimate
interests.  See BDO Seidman, 712 N.E.2d at 1223.

    That conclusion aside, IBM fails to establish that it seeks
to protect a "legitimate" interest here.  In this context, New
York courts limit "legitimate" employer interests "to the
protection against misappropriation of the employer's trade
secrets or of confidential customer lists, or protection from
competition by a former employee whose services are unique or
extraordinary."  Id.

    Neither party asserts that Mr. Visentin's skills as a
manager are "unique or extraordinary," and IBM produced no
persuasive evidence that Mr. Visentin's managerial skills are
somehow "unique or extraordinary."  Indeed, the Court credited
Mr. Visentin's and Mr. Ionnatti's testimony that Mr. Visentin's
general managerial skills are his marketable trait.  (Tr. 351:5-
9, 383:8-384:3, 461:20-462:3, 541:20-548:8.)

    Instead, IBM argues that that it has a legitimate interest
in protecting its trade secrets and confidential information.
IBM's noncompetition agreement could, in the abstract, serve to

protect IBM's legitimate interest in this type of information;
however, IBM has not demonstrated that it seeks to protect trade
secrets or confidential information from misappropriation by Mr.
Visentin.[7]  As noted above, IBM has not presented evidence
sufficient to convince this Court that Mr. Visentin possesses
much in the way of trade secrets or confidential information in
the first place.  See supra Part II.b.i.1.  IBM did demonstrate
that Mr. Visentin had some confidential information about a
potential IBM acquisition target (disclosure of which would
violate his nondisclosure agreement anyway) and some pipeline
information.  See supra Part II.b.i.1.  IBM has not
demonstrated, however, that Mr. Visentin poses a threat of
disclosure of any such information once he begins his new
position at HP.  See supra Part II.b.i.2.  Furthermore, to the
extent that Mr. Visentin has some IBM confidential information,
he has agreed to limit his employment in his first year at HP in
order to avoid potential conflicts.  See supra Parts I.f,
II.b.i.2.a.  The fact that he need not draw on any such
information he may have is persuasive.  See, e.g., SG Cowen, 224
F.3d at 84 (stating that "it is difficult to see how [the prior

---

[7] Because the reasonableness of IBM's Noncompetition Agreement is
determined on a case-by-case basis, see Ticor Title Ins., 173
F.3d at 70, the Court does not and cannot address the validity
of the Noncompetition Agreement under New York law generally.

employer] is seriously harmed" by denying an injunction where employee agreed to not divulge trade secrets or other confidential information); <u>Baxter Int'l, Inc. v. Morris</u>, 976 F.2d 1189, 1197 (8th Cir. 1992) (affirming the refusal to enforce a noncompetition agreement in part because the district court found that the employee was able to compete without disclosing trade secrets). As noted above, the Court credited the testimony of both Mr. Visentin and Mr. Iannotti to this effect. <u>See</u> <u>supra</u> Part II.b.i.2.a. Given Mr. Visentin's specific circumstances, the Court finds that IBM has not demonstrated a legitimate interest it now needs to protect.[8]

---

[8] IBM points to other decisions that it asserts enforced noncompetition agreements with similar language. But as previously discussed, those cases are distinguishable on their facts and thus do not support IBM's request for relief here. For example, <u>IBM v. Papermaster</u> concerned an employee with detailed technical knowledge of IBM's microprocessor development. 2008 WL 4974508, at *8. Because the employee was going to work on analogous microprocessor technology for a direct competitor, the <u>Papermaster</u> Court was properly concerned about the disclosure of trade secrets. <u>Id.</u> at *8-9. But in this case, Mr. Visentin possesses no similar technical knowledge and will not be expected to draw upon his prior, specific job function know-how with HP. <u>See</u> <u>supra</u> Parts II.b.i.1, II.b.i.2.a. Similarly, <u>Estee Lauder Cos. v. Batra</u> involved a senior executive in charge of marketing strategy, pricing, and account management strategy for Estee Lauder's cosmetic dermatology brands. 430 F. Supp. 2d at 161-62. He sought to work as the worldwide manager of a competitor's cosmetic dermatology brands with responsibility for marketing strategy. <u>Id.</u> at 164. IBM has not demonstrated that Mr. Visentin's prior responsibilities involved similarly intimate knowledge of proprietary business information. <u>See</u> <u>supra</u> Part II.b.i.1.a-k. Moreover, the <u>Estee Lauder</u> Court did not find the defendant
(cont'd on next page)

Moreover, the testimony of the architect of IBM's noncompetition program, Mr. MacDonald, indicates that IBM's Noncompetition Agreement is designed not to protect a legitimate business interest but, rather, to keep the leadership talent of IBM from leaving.  (Tr. 574:23-575:3 ("Q. The noncompetition agreement that you helped to draft and adopted was driven to protect the talent of IBM from leaving; isn't that right?  A: Yes, sir.  Q:  It was a device to keep them employed by IBM?  A. Yes, sir.").)  Indeed, Mr. MacDonald testified that IBM views its noncompetition agreements as "retention devices."  (Tr. 576:6-576:15.)

Additionally, the clawback provision appears to be punitive; its only real purpose is to make it prohibitively expensive for an employee to leave his current employment with IBM.  (Tr. 589:22-591:23.)  It has no discernable relation to the legitimate interest of protecting trade secrets.  Further, the evidence shows that the noncompetition agreements at IBM were never altered based upon the specific functions performed by an employee.  (Tr. 384:4-385:3, 577:22-578:5, 592:24-593:7.)  If the primary purpose of the noncompetition agreements were to

---

(cont'd from previous page)
credible because he had "not proven the most trustworthy" in his fulfillment of his obligations.  Estee Lauder, 430 F. Supp. 2d at 176.  Such is not the case here.

protect trade secrets or confidential information, IBM could have drafted specifically tailored noncompetition agreements recognizing the unique information (or even business areas) it sought to protect.  It did not do so.

Finally, in an effort to blunt the force of these facts, Mr. MacDonald testified that in each case IBM applies a "process" where it discusses the specifics of a departing employee's future job and attempts to construct a means for the to work there without violating the agreement.  There is no evidence that IBM undertook that "process" here, and the lack of such process here suggests that IBM's primary concern was not protecting any specific trade secrets.  The combined force of all of these facts persuades the Court that IBM's purpose was not to protect its legitimate interests but to prevent its employees from taking employment elsewhere.

The evidence IBM adduced at the hearing fails to demonstrate affirmatively any legitimate interest IBM needs to protect.  See BDO Seidman, 712 N.E.2d at 1223-25; Natural Organics, Inc. v. Kirkendall, 52 A.D.3d 488, 489-90 (N.Y. App. Div. 2008).  The testimony from Mr. MacDonald regarding IBM's motivations in pursuing its noncompetition program only buttresses the Court's view that IBM is not seeking to protect a legitimate interest.  Because the agreement, as IBM concedes, prohibits an employee from "engage[ing] or associate[ing] with"

57

a competitor, it prohibits Mr. Visentin from working for any competitor in any position in the world.  (Tr. 582:9-582:24.) Given IBM's failure to adduce evidence suggesting that it seeks to protect a legitimate interest, this prohibition is greater than necessary to protect IBM's legitimate interests.  BDO Seidman, 712 N.E.2d at 1223-25; see also Gilman & Ciocia, Inc. v. Randello, 897 N.Y.S.2d 669 (table decision).

For the reasons set forth above, Mr. Visentin has demonstrated that this agreement is overbroad and, thus, that it fails the first prong of the BDO Seidman test.  Even if that is not so, IBM has not satisfied the first prong of the BDO Seidman test because it failed to demonstrate that its prohibitions are needed to protect a "legitimate" interest.

### 2. Whether the Agreement Imposes an Undue Hardship

Even though the Court need go no further, BDO Seidman, 712 N.E.2d at 1223 ("A violation of any prong renders the covenant [not to compete] invalid,"), the agreement imposes an undue hardship on Mr. Visentin.  See id.  IBM asserts that because Mr. Visentin will receive his salary whether or not he actually works for HP in the next twelve months, enforcement of the noncompetition agreement is not an undue hardship on Mr. Visentin.  But monetary implications are not the only factor this Court must consider when evaluating the hardship on the

employee.  Future career prospects are an important factor as
well.  Mr. Visentin testified without contradiction that if he
does not work for the next twelve months, he is not guaranteed
the same position at HP.  (Tr. 392:23-393:12.)  The Court
credits Mr. Visentin's testimony that his not working for a year
will hamper significantly his ability to demonstrate his value
to HP, and thus, his ability to renew his contract.  See, e.g.,
Baxter, 976 F.2d at 1194 (affirming non-enforcement of
noncompetition agreement in part because a "a protracted absence
could alienate [the employee's] new employer").  Although Mr.
Visentin acknowledges that he is not a "technical" employee, he
testified without contradiction that being sidelined for the
next year will place him at a disadvantage in an industry that
evolves quickly.  (Tr. 392:20-393:12.)  The Court credits Mr.
Visentin's testimony and finds that the noncompetition agreement
would impose an undue hardship on his future employment
prospects.  IBM has failed to satisfy the second prong of the
reasonableness inquiry.

### 3.    Public Policy

In this case the parties did not focus their energies on
the public policy implications of the enforcement of this
agreement.  The Court finds that this factor does not cut in
favor of either party, although New York courts generally

disfavor broad restraints on competition.  See BDO Seidman, 712 N.E.2d at 1223.

### 4.    Conclusion and Coda

Based on the facts in the record the Court concludes that IBM has failed to satisfy its burden of showing that it is likely to succeed on the merits.

However, the Court adds a coda.  Typically, in the face of a noncompetition agreement that is unenforceable in toto, as here, courts will inquire whether partial enforcement is possible.  "The prevailing, modern view rejects a per se rule that invalidates entirely any overbroad employee agreement not to compete."  Id. at 1226.  Instead, "if the employer demonstrates an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct, but has in good faith sought to protect a legitimate business interest, consistent with reasonable standards of fair dealing, partial enforcement may be justified."  Id.  This is a "case specific analysis."  Id.

But here, IBM does not seek partial enforcement.  (Tr. 710:15-711:4.)  The Court thus need not consider this type of relief.  Nevertheless, given the Court's rejection of IBM's asserted legitimate business interest in this case, it is difficult to see how IBM could satisfy its burden to show a "good faith" effort "to protect a legitimate business interest."

BDO Seidman, 712 N.E.2d at 1226.  Thus, even if IBM were to seek partial enforcement, it would be unavailable.  Natural Organics, 52 A.D.3d at 490.

### iii. Sufficiently Serious Questions Going to the Merits

IBM also does not satisfy the alternative to demonstrating a likelihood of success on the merits.  Here, as stated supra in Part II.b.ii.2., the enforcement of the Noncompetition Agreement against Mr. Visentin would work an undue hardship on him.  Thus, the balance of hardships tilts in favor of Mr. Visentin. Moreover, given the Court's analysis of IBM's likelihood of success on the merits, there is not a sufficiently serious question about the merits of this case to warrant granting an injunction.  See Lusk, 475 F.3d 480 at 485.

III. Conclusion

IBM requests the extraordinary remedy of a preliminary injunction to enjoin a former employee from working for a competitor for a period of twelve months.  IBM has failed to carry its burden of proving that such extraordinary relief is justified based on the specific facts of this case as they relate to Mr. Visentin.  The Court finds that based on the testimony of witnesses, the exhibits at the hearing, and the declarations of the parties, IBM has failed to demonstrate (1) that it would suffer irreparable harm if Mr. Visentin is allowed to begin his work for HP and (2) that it is likely that IBM will succeed on the merits of its case.  Accordingly, IBM's request for a preliminary injunction [dkt. no. 3] is DENIED.  All other pending motions are denied as moot.


SO ORDERED.

Dated:     New York, New York
           February 16, 2011

                              *Loretta A. Preska*
                              LORETTA A. PRESKA, Chief U.S.D.J.